**CASE NO. 2:16-CV-46**

_____

IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF GEORGIA BRUNSWICK
DIVISION

_____

**ROBERT H. BARNETT, Liquidating
Trustee of the Sea Island Company
Creditors Liquidating Trust,**

Appellant,

**v.**

**KINGS POINT PROPERTY OWNERS
ASSOCIATION, INC.,**

Appellee.

_____

On Appeal from the United States Bankruptcy
Court For the Southern District of Georgia,
Brunswick Division

_____

**BRIEF OF THE APPELLEE**

_____

Jason M. Tate
ROBERTS TATE, LLC
2487 Demere Road, Suite 400
P.O. Box 21828
St. Simons Island, GA 31522
Tel: (912) 638-5200
Fax: (912) 638-5300
Email: jtate@robertstate.com

*Counsel for Appellee*

Thomas R. Walker
MCGUIRE WOODS LLP
1230 Peachtree Street, N.E.
Suite 2100
Atlanta, GA 30309
Tel: (404) 442-5705
Fax: (404) 443-5736
Email: trwalker@mcguirewoods.com

*Counsel for Appellee*

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................... ii

TABLE OF AUTHORITIES ............................................................ iii

STATEMENT OF THE ISSUES ...................................................... 1

STATEMENT OF THE CASE ......................................................... 5

SUMMARY OF ARGUMENT ........................................................ 9

ARGUMENT ..................................................................................... 11

  I.   The Bankruptcy Court properly found that KPPOA has standing in this matter ........................................................ 11

  II.  The Bankruptcy Court properly found that KPPOA the Debtors were required to convey the KPPOA common area to SIA as part of the "Purchased Assets" .................. 15

  III.  The Bankruptcy Court properly found that the duty to transfer the "Purchased Assets" and Debtors' "Business" was not extinguished or waived at closing and did not merge into the deed ...................................................... 27

  IV.  The Bankruptcy Court properly exercised its power and duty to construe the Confirmation Order to protect the integrity of the transaction it sanctioned ......................... 32

CONCLUSION .................................................................................. 36

CERTIFICATE OF COMPLIANCE ............................................... 36

# TABLE OF AUTHORITIES

**Cases:**

*Anderson v. Anderson,* 274 Ga. 224, 226, 552 S.E.2d 801 (2001) ............... 25

*Apex Carpet Finishers. Inc. v. Textile Rubber & Chemical, Inc.*,

585 F.2d 1324 (5th 1978) ........................................................ 33-35

*Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) ............ 33

*Bryant v. Turner,* 150 Ga.App. 65, 256 S.E.2d 667 (1979) ....................... 31

*Capital Color Printing, Inc. v. Ahern,* 291 Ga. App. 101, 661

S.E.2d 578 (2008) ................................................................... 16

*Churches Homes for Business Girls, Inc. v. Manget Foundation, Inc.,*

110 Ga. App. 539, 139 S.E.2d 138 (1964) .................................... 27

*Citrus Tower Boulevard Imaging Ctr., LLC v. Owens,*

325 Ga. App. 1, 752 S.E.2d 74 (2013) ......................................... 16

*Clark v. AgGeorgia Farm Credit ACA*, 333 Ga. App. 73,

775 S.E.2d 557 (2015) ......................................................... 25, 26

*Clay v. Phœnix Ins. Co.,* 97 Ga. 44, 25 S. E. 417 (1895) ...................... 31

*Cohen v. Sandy Springs Crossing Assocs., L.P.,* 238 Ga.App.

711, 520 S.E.2d 17 (1999) ........................................................ 25

*Grantham v. Royal Ins. Co.,* 34 Ga. App. 415, 130 S.E. 589 (1925) .......... 31

*Homelife Communities Group v. Rosebud Park, LLC,*

280 Ga. App. 120, 122, 633 S.E.2d 423 (2006) ............................. 19

*In re: Biscayne Park, LLC*, 540 Fed. Appx. 952, 955 (11th Cir. 2013) ........ 2

*In re: Club Associates*, 951 F.2d 1223, 1229 (11th Cir. 1992) ................. 3

*In re: Consolidated Indus. Corp.*, 360 F.3d 712 (7th Cir. 2004) ............. 4

*In re: Dial Business Forms, Inc.*, 341 F.3d 738 (8th Cir. 2003) ............... 4

*In re: E.S. Bankest, L.C.*, 321 B.R. 590 (Bankr. S.D. Fl. 2005) ................. 13

*In re: Financial Federated Title & Trust, Inc.*, 309 F.3d 1325

(11th Cir. 2002) ..................................................................... 3

*In re: Issac Leaseco, Inc.*, 389 F.3d 1205, 1209 (11th Cir.2004) ............. 3

*In re: Morris Publishing Group LLC, et al.*, 2010 WL 599393 at *4

(Bankr. S.D. Ga.) .................................................................. 12, 13

*In re: Optical Techs., Inc.*, 425 F.3d 1294 (11th Cir. 2005) ................. 3

*In re: Ranch House of Orange–Brevard, Inc.*, 773 F.2d 1166, 1168

(11th Cir.1985) ...................................................................... 3

*In re: Sea Island Co.*, 486 B.R. 559, 565 (S.D. Ga. 2013) ................. 4

*In re: Tarrer*, 273 B.R. 724, 731 (Bankr. N.D. Ga. 2001) .............. 12

*McCollum v. Loveless*, 187 Ga. 262, 267 (3), 200 S.E. 115 (1938)........32

*McLendon v. Priest,* 259 Ga. 59, 60, 376 S.E.2d 679, 680 (1989) .......... 26

*New Hampshire v. Maine,* 532 U.S. 742, 750 (2001) ................. 15

*Order Homes, LLC v. Iverson,* 300 Ga. App. 332, 685 S.E.2d 304(2009) 16

*P.B.R. Enterprises v. Perren,* 243 Ga. 280, 253 S.E.2d 765 (1979)..........31

iv

*Rainbow USA, Inc. v. Cumberland Mall, LLC,* 301 Ga. App.

642, 688 S.E.2d 631 (2009) ................................................................ 16

*Rasmussen v. Martin*, 236 Ga. 267, 223 S.E.2d 663 (1976) .............. 32

*Snipes v. Marcene P. Powell & Associates, Inc.,* 273 Ga. App. 814, 616

S.E.2d 152 (2005) ............................................................... 17, 19-21

*Southland Development Corp. v. Battle,* 272 Ga. App. 211, 612 S.E.2d 12

(2005) ................................................................................ 16

*Stearns Bank, N.A. v. Mullins,* 333 Ga. App. 369, 776 S.E.2d 485 (2015) 16

*Stefano Arts v. Sui,* 301 Ga. App. 857, 690 S.E.2d 197 (2010) ............ 16

*Talerica v. Grove Park Plumbing Serv.*, 103 Ga.App. 714 120 S.E.2d 36

(1961) ................................................................................. 29

*Willesen v. Ernest Commc'ns, Inc.,* 323 Ga. App.

457, 746 S.E.2d 755 (2013) ................................................... 26

*Williams v. Columbus Clinic, P.C.,* 332 Ga.App. 714, 773 S.E.2d 457

(2015) ................................................................................. 16

*Woodall v. Pharr,* 119 Ga. App. 692, 168 S.E.2d 645 (1969) ........... 28

*Worthey v. Holmes,* 249 Ga. 104, 105(1), 287 S.E.2d 9 (1982) ........... 31

*Wright v. Piedmont Eng'g & Const. Corp.,* 106 Ga. App. 401,

126 S.E.2d 865 (1962) ........................................................... 29

**Statutes:**

11 U.S.C. § 1109(b) ............................................................... 9, 12, 13

Fed. R. Bankr. P. 8014 .................................................................................... 1

Fed. R. Bankr. P. 8015 .................................................................................... 1

O.C.G.A. § 13-2-3 .................................................................................... 16, 26

## BRIEF OF APPELLEE

Pursuant to Fed. R. Bankr. P. 8014, Kings Point Property Owners Association, Inc. ("KPPOA") files its Appellee Brief as follows:

## STATEMENT OF THE ISSUES PRESENTED

This appeal arises from a Motion to Clarify Provisions Relating to the Implementation of the Confirmed Plan ("Motion to Clarify") seeking an order from the Bankruptcy Court clarifying and confirming that the intent under the Confirmed Plan and the Confirmation Order was for the "Purchased Assets" and the assets of Debtors' "Business," as those terms were defined by the October 19, 2010 Asset Purchase Agreement ("APA") between Debtors and SIA, to be transferred from Debtors to SIA.  The Motion to Clarify further sought an order from the Bankruptcy Court clarifying and confirming that the post-Closing discovery of "Purchased Assets" and assets of Debtors' "Business" that were not specifically identified in the APA or transferred at Closing were to be transferred by Debtors to SIA, that the Confirmation Order never intended for the Liquidation Trust to have any interest in the "Purchased Assets" or assets of Debtors' "Business", and that the interest of the Liquidation Trust was limited to the "Excluded Assets," as that term was defined by Section 2.2 of the APA.  The Kings Point Common Areas, which are the subject of this appeal, were included as part of the relief sought by the Motion to Clarify

1

because the Kings Point Common Areas are part of the "Purchased Assets" and was an asset of Debtors' "Business" as those terms are defined by the APA.

On appeal, this Court must determine whether the Bankruptcy Court properly construed the Confirmed Plan, the Confirmation Order, and the APA to require the Debtors to transfer all of the "Purchased Assets" and Debtors' "Business," including the Kings Point Common Areas, to SIA, and properly found that Appellant's had no interest in the Kings Point Common Areas, as part of the "Purchased Assets." The decision of the Bankruptcy Court is due to be affirmed.  The Bankruptcy Court met its obligation to apply the provisions of the APA, the Confirmed Plan, and the Confirmation Order in a manner that upholds the intent of the Parties, and satisfied its duty to ensure that the obligations and benefits arising under transactions it has sanctioned are protected.

At its core, this appeal concerns the authority, obligation, and duty of the Bankruptcy Court to enter orders to protect the integrity of the transactions that are approved and implemented by through the Confirmation Order.  To the extent that the issues presented to this Court concern the interpretation of the Confirmed Plan or Confirmation Order by the Bankruptcy Court, then such issues are to be reviewed by this Court under an abuse of discretion standard of review. *See In re Biscayne Park, LLC*, 540 Fed. Appx. 952, 955 (11th Cir. 2013) ("[w]hen reviewing a

Bankruptcy Court's interpretation of the effect of its own order, this Court will defer to that interpretation unless the Bankruptcy Court clearly abused its discretion.").

In interpreting the Confirmed Plan or the Confirmation Order, however, the Bankruptcy Court was also required to interpret the intent of the Parties to the APA as it relates to the obligation to transfer the "Purchased Assets," which admittedly includes the Kings Point Common Areas. To the extent that the issues presented to this Court concern contractual construction of the APA by the Bankruptcy Court, then such issues are to be reviewed by this Court under a *de novo* standard of review. *See In re Club Associates*, 951 F.2d 1223, 1229 (11th Cir. 1992)("[s]pecifically, this court has held that a bankruptcy court's interpretation of unambiguous contractual language is a legal determination subject to *de novo* review").

In *In re Optical Techs., Inc.*, 425 F.3d 1294, 1299–300 (11th Cir. 2005), the 11th Circuit Court of Appeals explained the differing standards of review as follows:

> In the bankruptcy context, this court sits as a "second court of review" and thus "examines independently the factual and legal determinations of the bankruptcy court and employs the same standards of review as the district court. *In re Issac Leaseco, Inc.*, 389 F.3d 1205, 1209 (11th Cir.2004) (quotation marks and citation omitted). Generally, we review legal conclusions by either the bankruptcy court or the district court de novo. *In re Financial Federated Title & Trust, Inc.*, 309 F.3d 1325, 1328–29 (11th Cir.2002). We review the bankruptcy court's findings of fact for clear error. *Id.* at 1329.

> In considering the bankruptcy court's interpretation of the effect of its own order, we apply a different standard of review. While we have not definitively articulated that standard, we have said that "we are reluctant to disturb a bankruptcy court's judgment interpreting its own

3

earlier order," and that the "bankruptcy judge who has presided over a case from its inception is in the best position to clarify any apparent inconsistencies in the court's rulings." *In re Ranch House of Orange–Brevard, Inc.*, 773 F.2d 1166, 1168 (11th Cir.1985).

The other circuits that have considered this question have uniformly agreed that our "reluctan[ce] to disturb a bankruptcy court's judgment" in this context is akin to the reluctance we exhibit when exercising abuse of discretion review. *See In re Consolidated Indus. Corp.*, 360 F.3d 712, 716 (7th Cir.2004) ("We will not reverse a [bankruptcy] court's interpretation of its own order unless it is a 'clear abuse of discretion,' because a court that issued an order is in the best position to interpret it."); *In re Dial Business Forms, Inc*., 341 F.3d 738, 744 (8th Cir.2003) (adopting abuse of discretion review and collecting cases from the Second, Fifth, and Sixth Circuits that have done the same). We adopt this view. Accordingly, will defer to the bankruptcy court's interpretation of its order confirming the Fourth Amended Plan, unless it clearly abused its discretion.

Notably, in rendering a decision, the Bankruptcy Court can both interpret an order or plan and render a legal conclusion regarding the application of the plan. *See In re Sea Island Co.*, 486 B.R. 559, 565 (S.D. Ga. 2013)("[t]urning first to whether the bankruptcy court interpreted the Plan or reached a legal conclusion: the Court finds the bankruptcy court did both."). In *Sea Island Co.*, 486 B.R. at 565, the Bankruptcy Court interpreted the Confirmed Plan and made the legal conclusion that the relief granted to the trustee did not modify the plan. Thus, on appeal, the District Court applied the *de novo* standard of review to the legal conclusion and an abuse of discretion standard to the interpretation of the plan. *Id*. at 566.

Albeit under either standard, however, the legal obligation of this Court, much like the Bankruptcy Court, is to give effect to the intent of the Parties to the APA, as

approved and implemented through the Confirmed Plan and Confirmation Order. Whether under the rules of contractual construction or the obligation of the Bankruptcy Court to interpret and enforce its orders to protect the integrity of its process, the outcome is the same because under either standard the intent of the Parties clearly, unambiguously, and undeniably provides for the transfer of the "Purchased Assets" from the Debtors to SIA, which admittedly includes the Kings Point Common Areas.

## STATEMENT OF THE CASE

The King's Point Subdivision is a residential development that was developed by the Sea Island Company. (A. 460-462).[1]  Pursuant to the Final Plat for Kings Point Subdivision and Compilation of Restrictions, Covenants, Conditions, Limitations, Reservations, Easements, Rights and Privileges Relating to Kings Point ("Declaration"), certain lots, streets, and other areas in the Kings Point Subdivision are designated "Common Areas." (A. 461). Pursuant to the Declaration, Sea Island Company was obligated to convey the "Common Areas" to KPPOA, which was created by the Declaration, in part, to own and maintain the "Common Areas." (A. 462, Supp. A. 51).

Through a deed dated December 17, 2009, Sea Island Company purported to convey the "Common Areas" to KPPOA ("2009 Deed"). (A. 462). Sea Island

---

[1] The majority of the citations herein are to Appellant's Appendix labeled as "A."

Company, however, did not own the Common Areas referenced in the 2009 Deed at the time it was executed. (A. 1462).  Sea Island Coastal Properties, LLC owned the Kings Point Common Areas on December 17 and 18, 2009. (A. 1463).  Since the 2009 Deed stated that Sea Island Company was the grantor rather than Sea Island Coastal Properties, LLC, the 2009 Deed was not effective and did not transfer the Common Areas to KPPOA. (A. 463).

On August 10, 2010, Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Services, Inc., First Sea Island, LLC, Sea Island Apparel, LLC, Sea Island Resort Residences, LLC, and SICAL, LLC (hereinafter "Debtors") filed Chapter 11 Bankruptcy. (A. 466). Sea Island Coastal Properties, LLC owned the KPPOA Common Elements on the date the bankruptcy petition was filed. (A. 466). The purpose of Debtors' bankruptcy was to effect an orderly sale of substantially all of Debtors' assets. (A. 463, 465, 466).  On September 24, 2010, the Debtors filed the Debtors' Amended and Restated Joint Chapter 11 Plan as of August 10, 2010 which provides for the sale of the "Purchased Assets" by Debtors ("Confirmed Plan"). (A. 486; accord A. 1-54) The Confirmed Plan defines "Purchased Assets" as "those assets of the Debtors that the Purchaser is acquiring pursuant to the Asset Purchase Agreement," which as defined in the Confirmed Plan means the October 19, 2010 Asset Purchase Agreement between Debtors and Sea Island Acquisition, LLC ("SIA"). (A. 487).

On October 19, 2010, the Debtors and SIA entered into the Asset Purchase Agreement under which Debtors agreed to sell and SIA agreed to acquire the "Purchased Assets" (the "APA"). (A. 467, 471; Supp. A. 55-332).[2] SIA agreed to pay $210,000,000.00, subject to certain adjustments, for the "Purchased Assets" under the APA. (A. 468; 75). Section 2.1 of the APA defines the "Purchased Assets," which, pertinent to this appeal, include Debtors' "Acquired Owned Real Property." (A. 468-470; Supp. A. 69-71). "Acquired Owned Real Property" is defined by the APA as: (a) **all** of the Owned Real Property, including, but not limited to, the Owned Real Property set forth on Schedule 2.1(a), but excluding the Excluded Owned Real Property, and (b) the Specified Condo Units." (A. 470; 60). "Owned Real Property" is defined by the APA as "**all** land, together with all Improvements located there on and all easements, rights-of-way, servitudes, tenements, herediments, appurtenances, privileges and other rights and interest apartment there to owned by any Seller." (A. 471; 65). The schedule of "Excluded Owned Real Property" identifies **no** property that was to be excluded from the transfer to SIA under the APA. (A. 473; 143).  Section 3.15 of the APA also provides that "[t]he Acquired Owned Real Property is **all** of the real property owner used in connection with the Business as currently conducted." (A. 477; 83). Section 3.15 of the APA further

---

[2] References to the documents contained in Appellee KKPOA's Appendix are indicated by reference to "Supp. A."

describes the "Purchased Assets" as constituting "all of the assets, properties, and rights required for the conduct of the Business as currently conducted and as conducted as of the Closing Date." (A. 470; 83).

The Kings Point Common Areas constitute "land . . . owned" by one a "Seller" at the time the APA was signed. (A. 467, 471). The Kings Point Common Areas are "Owned Real Property" as that term is defined by the APA. (A. 471). The Kings Point Common Areas are "Acquired Owned Real Property" as that term is defined by the APA. (A. 471, 509). The Kings Point Common Areas were part Debtors' "Business" as that term is used in the APA on both the date the APA was signed and on the Closing date. (A. 477, 509). The Kings Point Common Areas are "Purchased Assets" under Section 2.1 of the APA. (A. 471, 509).

On November 8, 2010, the Court entered the Findings of Fact, Conclusions of Law, and Order Confirming the Amended and Restated Joint Chapter 11 Plan as of August 10, 2010 filed by the Debtors ("Confirmation Order"). (A. 333). The Confirmation Order specifically approved the APA and the transactions contemplated by the APA. (A. 333-395). The Confirmation Order further provides that in the event of any inconsistencies between the APA, Plan, Disclosure Statement, or any other instrument or document created or executed pursuant to the Plan, the APA controls. (A. 373). The Liquidation Trust, and all related documents, were created pursuant to Section 5.04 of the Confirmed Plan. (A. 487). The Closing

of the APA occurred on December 15, 2010. (A. 509).  The KPPOA Common

Areas, however, were not transferred from Debtors to SIA on the Closing date. (A.

191).

## SUMMARY OF THE ARGUMENT

Through the Motion to Clarify, the Bankruptcy Court properly applied the

unambiguous provisions of the APA, which was implemented through and given

effect by the Confirmed Plan and Confirmation Order, in a manner to uphold the

undisputed intent of the Parties.  Although not a party to the APA, the Bankruptcy

Court properly found that KPPOA is a party in interest under the broad construction

to be afforded to 11 U.S.C. § 1109(b).  As an "entity" with a vested interest in the

Kings Point Common Areas that would be affected by the Bankruptcy Court's

consideration of the issues raised by the Motion to Clarify, KPPOA had standing in

this matter.  Further, the settlement under which SIA, the party that originally filed

the Motion to Clarify, withdrew its request for relief does not change this analysis

both because KPPOA has independent standing, and because Appellant specifically

agreed as part of the settlement with SIA (and represented to the Bankruptcy Court)

that SIA's withdrawal of its request for relief would not affect KPPOA's standing.

Moving on to the merits, when evaluating contracts, Georgia law requires a

Court to construe and apply the provisions of the contract to uphold the intent of the

parties, regardless of the formalities. The cardinal rule of contractual construction,

and penultimate obligation of the Bankruptcy Court and this Court, is to **ALWAYS** give effect to the intent of the Parties to the APA. The Bankruptcy Court met this obligation by requiring the Debtors to transfer all of the "Purchased Assets," including the Kings Point Common Areas, to SIA, and properly found that Appellant's had no interest in the Kings Point Common Areas, as part of the "Purchased Assets."

In addition, the Bankruptcy Court had a separate and independent duty to uphold the intent of the Parties to the APA, regardless of formalities, in order to protect the integrity of the transactions that are sanctioned under its authority. Notwithstanding that the Bankruptcy Court properly applied the unambiguous provisions of the APA in a manner to uphold the undisputed intent of the Parties, the Bankruptcy Court properly exercised its power and duty to protect the integrity of the transaction that was approved and implemented by through the Confirmation Order in applying the APA in a way that upheld the intent of the Parties by requiring the conveyance of the "Purchased Assets" from Debtors to SIA. The Bankruptcy Court was duty bound under binding precedent to ensure that the intent of the Parties to the APA was effected, regardless of formalities, and ensure that SIA was not deprived of its benefits under the APA based on a technicality. For all these reasons, the Bankruptcy Court's March 4, 2016 Order is due to be affirmed.

## **ARGUMENT**

The Bankruptcy Court properly construed the Confirmed Plan, the Confirmation Order, and the APA to require the Debtors to transfer all of the "Purchased Assets," including the Kings Point Common Area, to SIA, and properly found that Appellant had no interest in the Kings Point Common Area, as part of the "Purchased Assets." In short, the Bankruptcy Court properly held that there was "no ambiguity and no question as to the intent of the [P]arties" with respect to the Debtors' obligation to "convey **all** of the Owned Real Property, including the Common Areas, to [the Purchaser] and **none** of the Owned Real Property was to be excluded from the required conveyance." (A. 554) (emphasis in original). Whether under the rules of contractual construction or its inherent power and duty, the Bankruptcy Court properly construed the APA and Confirmation Order to uphold the intent of the Parties by finding that the KPPOA Common Elements were required to be conveyed from Debtors to SIA as part of the "Purchased Assets."

## I.   **THE BANKRUPTCY COURT PROPERLY FOUND THAT KPPOA HAS STANDING IN THIS MATTER.**

Appellant argues the Bankruptcy Court erred in holding that KPPOA has standing to litigate ownership of its own Common Areas and to seek redress for the significant harm it will suffer if Appellant is determined to be the legal owner of the same. Appellant's arguments focus on KPPOA's alleged loss of "piggyback standing" following SIA's withdrawal of its claim for relief in this matter, and ignore

11

that KPPOA has independent standing to pursue its claims in this case. Moreover, notably, Appellant's arguments are in direct contravention to agreements and representations it made to the Bankruptcy Court regarding KPPOA's standing.

To begin, KPPOA is a "party in interest" 11 U.S.C. § 1109(b) as properly determined by the Bankruptcy Court. Under federal law, the term "party in interest" is not restrictive, but is "'to be construed broadly, in order to allow parties affected by a Chapter 11 case to appear and be heard.'" *In re Tarrer*, 273 B.R. 724, 731 (Bankr. N.D. Ga. 2001). Indeed, Section 1109(b) was intended to "confer[ ] broad standing at the trial level," and to "continue[ ] in [the] tradition" of "encourag[ing] and promot[ing] greater participation in reorganization cases." *Id.*  Moreover, the concepts of being a party in interest under Section 1109(b) and constitutional standing have been interpreted by courts to be coextensive.[3] *Id.*  Thus, the question for standing purposes in a bankruptcy context is whether the party asserting standing has a legally protected interest that can be affected by the matter at issue. *Id.*  Put another way, to be a party in interest under Section 1109(b), an entity must "have a pecuniary interest that is directly or adversely affected by the outcome of the proceeding, such that the entity requires representation." *In re Morris Publishing*

_____

[3] The federal requirements for standing to participate in a bankruptcy matter include that the party in interest must: "(1) have suffered an actual injury or show the imminence of such injury; (2) establish that the injury is fairly traceable to the conduct at issue; and (3) demonstrate that the requested relief is likely to redress the injury." *In re Tarrer*, 273 B.R. at 731.

*Group LLC, et al.*, 2010 WL 599393 at *4 (Bankr. S.D. Ga.); *In re E.S. Bankest, L.C.*, 321 B.R. 590, 595 (Bankr. S.D. Fl. 2005) ("[t]he general theory … is that anyone holding a direct financial interest in the outcome of a case should be able to participate to protect their interest.")).  KPPOA has vested interests in and a legal duty to maintain the Kings Point Common Areas under the Declaration. (Supp. A. 46). Accordingly, the Bankruptcy Court properly found that KPPOA has standing.

In addition, KPPOA has standing under the clear provisions of the Confirmed Plan and Confirmation Order, through which the Bankruptcy Court specifically retained jurisdiction to:

> determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan and the Plan Supplement) on in the Confirmation Order, including…any Entity's rights arising under or obligations incurred in connection therewith.

(A. 359). An "Entity" means "any…corporation." (A. 11). Notwithstanding that KPPOA is a party in interest under Section 1109(b), KPPOA has rights arising under the Confirmed Plan and Confirmation Order in that it has a vested interest in a portion of the Debtors' estate, i.e. the Kings Point Common Areas.[4]

---

[4] Appellant's argument against KPPOA's standing in this case focuses primarily on the Quitclaim Deed conveying the Common Areas from SIA to KPPOA. This Quitclaim Deed, however, is nothing more than a formal acknowledgment that KPPOA is the rightful owner of the Kings Point Common Areas as a result of the Declaration which encumbers and obligates the property. (Supp. A. 46, 51). Although it provides yet another basis for standing, KPPOA's standing in this matter

Appellant does little to address why it contends KPPOA does not have independent standing in this matter. Instead, Appellant's argument that KPPOA lacks standing is largely predicated on its argument that KPPOA's standing vanished when SIA, the party that originally filed the Motion to Clarify, withdrew its request for relief.  In essence, Appellant is not so much arguing that KPPOA lacks standing, as it is arguing that the Bankruptcy Court's authority to hear the dispute disappeared when SIA withdrew its request for relief. Apart from failing to address KPPOA's independent standing to maintain this action, Appellant's argument also fails to be candid with the Court regarding the circumstances under which SIA withdrew its request for relief and Appellant's representations to the Bankruptcy Court regarding the same. SIA did not withdraw its request for relief under the Motion to Clarify unconditionally.  Instead, SIA's withdrawal of its request for relief was part of a compromise and settlement with Appellant. (Supp. A. 74-94). Pursuant to this compromise and settlement, Appellant filed a Motion to Approve a Compromise and Settlement, to which KPPOA and others, objected to the extent that it affected the Court's ability to resolve the ongoing dispute regarding the Kings Point Common Areas (and other matters raised by the Motion to Clarify). (Supp. A. 99-112). To resolve these objections, the parties, including Appellant, reached an agreement and

---

is not predicated on the existence of the Quitclaim Deed.  KPPOA's legal interests in the Kings Point Common Areas, and by extension, the Debtors' Estate, exists under the Declaration independent of the Quitclaim Deed. (Supp. A. 46, 51).

specifically consented to the entry of an order by the Bankruptcy Court providing that **"neither the entry of this Order nor the existence, approval, or terms of the Settlement Agreement shall affect the standing of Kings Point POA in the contested matter**…" (Supp. A. 113-125; 128). In other words, Appellant made representations to the Bankruptcy Court that SIA's withdrawal would not affect KPPOA's standing in this case in an effort to secure approval of its settlement with SIA over the objections. Yet, now, having received an adverse ruling from the Bankruptcy Court on the merits and in favor of KPPOA, Appellant takes a position that directly contradicts this agreement and representation to the Bankruptcy Court. In addition to KPPOA's independent standing to maintain this action, Appellant is judicially estopped from taking a position that is inconsistent with the agreement and representations made to the Bankruptcy Court. *See New Hampshire v. Maine,* 532 U.S. 742, 750 (2001)(expressly adopting the doctrine of judicial estoppel "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment").

## II. THE BANKRUPTCY COURT PROPERLY FOUND THAT THE DEBTORS WERE REQUIRED TO CONVEY THE KPPOA COMMON AREAS TO SIA AS PART OF THE PURCHASED ASSETS.

As noted by the Bankruptcy Court and Appellant, the APA is governed by Georgia law. (A. 105). Under Georgia law, the first step in the construction of a contract, such as the APA, is to determine whether the language used is clear and

unambiguous. *See Southland Development Corp. v. Battle,* 272 Ga. App. 211, 612 S.E.2d 12 (2005). If so, the Bankruptcy Court was legally obligated to enforce those terms. *See e.g. Stefano Arts v. Sui,* 301 Ga. App. 857, 690 S.E.2d 197 (2010); *Rainbow USA, Inc. v. Cumberland Mall, LLC,* 301 Ga. App. 642, 688 S.E.2d 631 (2009); *Order Homes, LLC v. Iverson,* 300 Ga. App. 332, 685 S.E.2d 304 (2009). At all times, however, the Bankruptcy Court's overriding obligation was to ascertain and give effect to the intent of the Parties to the APA. *See Stearns Bank, N.A. v. Mullins,* 333 Ga. App. 369, 776 S.E.2d 485 (2015). Indeed, "[t]he cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, **it shall be enforced irrespective of all technical or arbitrary rules of construction.**" O.C.G.A. § 13-2-3; *accord Williams v. Columbus Clinic, P.C.,* 332 Ga.App. 714, 773 S.E.2d 457 (2015).

In this case, the Bankruptcy Court properly determined that the language of the APA was clear and unambiguous.[5]   **Indeed, both Appellant and Appellee**

---

[5] With respect to determining whether the language used in the contract is clear and unambiguous, Georgia courts have stated that an ambiguity exists where the language used in the contract leaves the intent of the parties in question. *See e.g. Citrus Tower Boulevard Imaging Ctr., LLC v. Owens,* 325 Ga. App. 1, 8, 752 S.E.2d 74, 81 (2013) ("A contract is ambiguous if the words used therein leave the intent of the parties in question—i.e., that intent is uncertain, unclear, or is open to various interpretations.") (citations and quotations omitted); *Capital Color Printing, Inc. v. Ahern,* 291 Ga. App. 101, 106, 661 S.E.2d 578, 583 (2008); *accord* A. 553.

**agree that the language used in the APA is clear and unambiguous.** Appellant and Appellee, however, disagree on outcome of the application of the clear and unambiguous language of the APA. But, this disagreement only arises because Appellant ignores the undisputed intent of the Parties to the APA, which is prohibited by Georgia law. As the Georgia Court of Appeals has stated:

> The fundamental rule, the rule which swallows up almost all others in construing a paper, is to give it that meaning which will best carry into effect the intent of the parties. This is the object of rules of interpretation, to discover the true intent of the parties, and in doing this we are to take the whole of the instrument together, and to consider this with the surrounding circumstances. The rules of grammatical construction usually govern, but even these may be disregarded in order to effectuate the intention. So, also, sentences and words may be transposed, and conjunctions substituted for each other.... The cardinal rule of construction is to ascertain the intention of the parties. If that intention be clear, and it contravenes no rule of law, and sufficient words be used to arrive at the intention, it shall be enforced, irrespective of all technical or arbitrary rules of construction. The construction which will uphold the contract in whole and in every part is to be preferred, and the whole contract is to be looked to in arriving at the construction of any part.

*Snipes v. Marcene P. Powell & Associates, Inc.,* 273 Ga. App. 814, 816, 616 S.E.2d 152, 155 (2005).

Appellant goes to great lengths in its Brief to have this Court misconstrue and misapply isolated provisions of the APA, the Confirmed Plan, and the Confirmation Order to reach an outcome that is unquestionably inconsistent with the Parties' intent. While Appellant postures the issues before this Court as a simple matter of contractual construction, Appellant's Brief is conspicuously devoid of any reference

to the intent of the Parties to the APA, even though the cardinal rule in interpreting, construing, or enforcing every contract, including the APA, is to give effect to the intent of the parties.

Such absence is not surprising considering that there is no reasonable argument that the Parties to the APA did not intend for all of the "Purchased Assets" or the Debtor's "Business" to transfer from Debtors to SIA. Indeed, this fact is admitted by Appellant. Appellant admits that the KPPOA Common Areas are "Purchased Assets," as that term is defined by the APA and as determined by the Bankruptcy Court, and were required to be conveyed by Debtors to SIA. (A. 471, 509). Appellant admits the Kings Point Common Areas are included in the Debtor's "Business," as that term is defined by the APA, and were required to be conveyed by Debtors to SIA. (A. 477, 509). Appellant's argument is not the Parties did not intend for "Purchased Assets" or Debtor's "Business," including the Kings Point Common Areas, to transfer from Debtors to SIA. Appellant's argument is that because the Kings Point Common Areas were mistakenly not conveyed "at Closing," then these assets automatically vested in the Liquidation Trustee under Section 5.04 of the Confirmed Plan, **regardless of what the Parties to the APA intended**.

Appellant's rigid technical argument misconstrues isolated provisions of the APA to defeat the intent of the Parties, and at the same time, falls victim to the same legal errors that Appellant alleges the Bankruptcy Court committed; most notably, it

ignores, and asks this Court to ignore, clear provisions of the APA.[6] Georgia law,

however, mandates that "… the construction which will uphold a contract in whole

and in every part is to be preferred, and the whole contract should be looked to in

arriving at the construction of any part. Moreover, no construction is required or

even permitted when the language employed by the parties in the contract is plain,

unambiguous, and **capable of only one reasonable interpretation**...." *Homelife*

*Communities Group v. Rosebud Park, LLC,* 280 Ga. App. 120, 122, 633 S.E.2d 423

(2006); *accord Snipes,* 273 Ga. App. at 816.

---

[6] Appellant's accusation that the Bankruptcy Court engaged in a "judicial re-write" of the Confirmed Plan and the APA is predicated on the fact that the Debtors were not to retain assets under the provisions of the Confirmed Plan, the Disclosure Statement, and the Confirmation Order. This fact is not disputed.  All of the "Purchased Assets" and Debtor's "Business," including the Kings Point Common Areas, were to be transferred from Debtors to SIA.  Everything that was not to be conveyed from Debtors to SIA was to vest in the Liquidation Trust.  The result of both would leave Debtors with no assets.  The failure of any or all of the "Purchased Assets" or Debtor's "Business" to transfer from Debtor's to SIA "at Closing," however, does not necessarily lead to the absurd result that such assets must vest in the Liquidation Trust.  Appellant's argument very simply ignores that such defect can be remedied through other provisions of the APA or the Bankruptcy Court's authority under the Confirmation Order so as to uphold, as opposed to defeat the intent of the Parties to the APA.  The Bankruptcy Court's Order provides for the transfer of any remaining "Purchased Assets" as required by the APA so as to give effect to the intent of the Parties, and result in the Debtor retaining no assets.  The interpretation by the Bankruptcy Court, unlike the interpretation put forth by Appellant, upholds the intent of the APA, the Confirmed Plan, and the Confirmation Order.

First, Appellant's argument is not a "reasonable interpretation" of the APA in that Appellant's interpretation does not uphold the intent of the Parties.  Instead, it impermissibly defeats the intent of the Parties, as well as the purpose of the APA and the entire structure of the transaction that was approved and implemented by the Bankruptcy Court through the Confirmed Plan and the Confirmation Order. *See e.g. Snipes,* 273 Ga. App. at 816. Under Appellant's interpretation, if **any** of the "Purchased Assets" did not transfer to SIA "at Closing", then they automatically vested in the Liquidation Trust under Section 5.04 of the Confirmed Plan.  SIA, however, paid $210,000,000.00, subject to certain adjustments, in consideration for the "Purchased Assets." (A. 468; 75).  Under Appellant's interpretation, in the event that the deed(s) executed by Debtors and delivered to SIA "at Closing" failed to convey title to any or all of the "Purchased Assets" to SIA for any reason, then the Liquidation Trustee would automatically own the "Purchased Assets." Moreover, based on Appellant's other arguments regarding waiver, extinguishment, and merger (which will be addressed in more detail below), SIA would have absolutely no recourse, and the Liquidation Trustee would not be required to return the "Purchased Assets."  In short, Appellant argues for an interpretation of the APA that could result in SIA paying $210,000,000.00 for the "Purchased Assets," but receiving none of the "Purchased Assets" in return. Simply stated, there can be no **reasonable** interpretation of the provisions of the APA that could lead to such an absurd outcome

and result in the complete destruction of not just the intent of the APA, but its sole purpose. *See e.g. Snipes,* 273 Ga. App. at 816.

Second, Appellant's entire argument is flawed because it elevates Section 5.04 of the Confirmed Plan **above** the provisions of the APA in violation of the clear direction of the Bankruptcy Court.  Paragraph 42 of the Confirmation Order provides a hierarchy of the operative relevant documents making clear that the documents are to be read to be consistent, but in the event of any inconsistency the APA controls. (A. 373).  So, the Confirmed Plan, including Section 5.04 which Appellant relies so heavily upon, is expressly subordinate to the provisions of the APA to the extent the provisions conflict. *Id.*  While not inherently inconsistent, Appellant has adopted an unreasonable interpretation of Section 5.04 of the Confirmed Plan which would defeat the purpose of the APA.  Even if the Court were to adopt this interpretation (which it should not because this Court, as properly done by the Bankruptcy Court, is obligated to read the provisions of the APA and Confirmed Plan to be consistent where possible), the Court would still be required to construe the provisions of the APA in such a way as to give effect to the intent of the Parties.  Section 5.04 of the Confirmed Plan, even if read as Appellant contends, cannot be used to defeat this intent under either Georgia law or the express provisions of the Confirmation Order. To the extent Appellant argues that the provisions of Section 5.04 of the Plan

override either the intent or purpose of the APA or its specific provisions, then this argument fails on its face.

Third, and perhaps most importantly, Appellant's position is belied by the express provisions of the APA. In essence, Appellant's argument requires the Court to find that **any** property that did not transfer "at Closing" automatically vested in the Liquidation Trust under Section 5.04 of the Confirmed Plan.  The APA, however, specifically defeats this argument. In particular, Section 7.1 of the APA is a "Further Assurances" provision which provides:

> Subject to the terms and conditions of this Agreement, Purchaser and Sellers will use their respective commercially reasonable efforts to take, or calls to be taken, all actions into do, or calls to be done, all things necessary or desirable under applicable Laws and regulations to consummate the Transactions contemplated by this Agreement.  Sellers and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and take such other actions as may be necessary or desirable in order to vest in Purchaser good title in the Purchase Assets or evidence the assumption by Purchaser of the Assume to Liabilities.  Notwithstanding anything to the contrary set forth herein, nothing in this Agreement shall be construed as requiring Purchaser or its affiliates to litigate or agree to hold separate or to dispose of any assets or property in order to obtain approval of any Governmental Authority of the consummation of the Transactions contemplated by this Agreement.

(A. 89).

There is no restriction contained in Section 7.1 temporally limiting the Parties obligation to take "... all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws and regulations to consummate the Transactions

contemplated by this Agreement..." to Closing. There is no restriction contained in Section 7.1 temporally limiting the Parties obligation "to execute and deliver such other documents, certificates, agreements and other writings and you take such other actions as may be necessary or desirable in order to vest in Purchaser a good title to the Purchased Assets...." to Closing. To the contrary, Section 7.1 reflects a clear intent of the Parties to ensure that good title to the "Purchased Assets" and Debtor's "Business" vest in SIA regardless of timing. Otherwise, SIA would be paying $210,000,000.00 with no assurance that it would get the "Purchased Assets" or Debtor's "Business" in return.

Even more detrimental to Appellant's argument, Section 7.9 of the APA, "Transfers Not Effected as of Closing," expressly contemplates that some of the "Purchased Assets" may not transfer at Closing. Under Appellant's argument, however, these assets would vest in the Liquidation Trust under Section 5.04 of the Confirmed Plan because they did not convey "at Closing" even though Section 7.9 provides that they would be conveyed at a later date.[7]  Although Section 7.9 has no

---

[7] Appellant's arguments regarding the interpretation and application of Sections 2.10 and 12.2 of the APA are completely defeated by Section 7.9 of the APA.  Appellant irrationally argues that Sections 2.10 and 12.2 of the APA required a deed conveying the KPPOA Common Elements from Debtors to Purchasers to be delivered.  Again, the need for a deed to effect the conveyance is not in dispute.  Much like the rest of Appellant's arguments, this argument is predicated on the **timing** of the delivery of that deed.  Appellant argues that under Sections 2.10 and 12.2, all deeds had to be delivered "at Closing" or any property not conveyed would automatically vest in the Liquidation Trust under Section 5.04 of the Confirmed Plan.  This argument holds

direct application in this instance, it is nonetheless relevant, along with Section 7.1, to show the Parties contemplated that not all of the "Purchased Assets" would transfer "at Closing" as asserted by Appellant, and reflects a clear intent to ensure that the "Purchased Assets" transferred from Debtors to SIA **period** – regardless of timing. It is difficult to comprehend how Appellant can reasonably argue, without exception, that any "Purchased Assets" that did not convey "at Closing" automatically vested in the Liquidation Trust where the APA expressly provides for post-Closing transfers of some of the "Purchased Assets." Any objective or reasonable interpretation of the APA in its entirety would not come to this conclusion. In short, Section 7.1 and Section 7.9 of the APA, read in concert with Section 2.1 of the APA, clearly create an absolute obligation to transfer the "Purchased Assets," as the Bankruptcy Court held; not just an obligation that is temporally limited "to Closing" as Appellant contends.

Finally, Appellant's position is belied by the post-closing conduct of the Parties to the APA which included in the post-Closing transfer of some of the "Purchased Assets" from Debtors to SIA. Under Georgia law, "[t]he parties' interpretation is entitled to great, if not controlling, influence, and will generally be adopted and followed by the courts, particularly when the parties' interpretation is

---

no water where Section 7.9 of the APA expressly provides that some transfers of the "Purchased Assets" can be conveyed post-Closing.

made before any controversy, or when the construction of one party is against his interest." *Anderson v. Anderson,* 274 Ga. 224, 226(2), 552 S.E.2d 801 (2001). Thus, "the construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them." *Cohen v. Sandy Springs Crossing Assocs., L.P.,* 238 Ga.App. 711, 712–713, 520 S.E.2d 17 (1999); *accord Clark v. AgGeorgia Farm Credit ACA*, 333 Ga. App. 73, 79, 775 S.E.2d 557, 562 (2015).   By stipulation, the Parties agree that Closing occurred on December 15, 2010. (A. 509).  Just over one month later, on January 19, 2011, the Parties to the APA executed and recorded a corrective deed to correct the incomplete or inaccurate legal description for some of the "Purchased Assets" that were contained in the Deed provided "at Closing" (hereinafter "Corrective Deed"). (A. 519; 528-533).  Notably, the Parties to the APA did not believe that these "Purchased Assets" automatically vested in the Liquidation Trust as asserted by Appellant (apparently neither did Appellant considering the Liquidation Trust was in effect and Appellant took no action to prevent this conveyance or recover these assets).  Instead, the Parties took steps to correct the mistake through the Corrective Deed to give effect to the clear intent reflected in the APA that all "Purchased Assets" transfer from Debtors to SIA, regardless of timing. The Parties interpretation of the APA as reflected by the execution and recording of the

Corrective Deed is "entitled to great, if not controlling, influence and will generally be adopted in followed by the courts, ......" *Clark,* 333 Ga. App. at 79.

The Parties' post-Closing conduct again highlights the absurdity of Appellant's fundamental position in this case. That, as a matter of a technicality, the "Purchased Assets" would automatically vest in the Liquidation Trust despite the clear intent of the Parties reflected in Section 2.1 of the APA, as well as the provisions contained in Section 7.1 and Section 7.9 of the APA, is not a reasonable interpretation. Appellant's position improperly ask this Court to read provisions of the APA in isolation to create an outcome that is not only completely inconsistent with the plain language of the APA, but also contravenes the Parties' clear intent and defeats the entire purpose of the APA.  Appellant's position improperly asks the Court to read provisions of the Confirmed Plan and Confirmation Order in isolation from the provisions of the APA and without regard to the clear intent of the Parties to the APA. This Court, like the Bankruptcy Court, however, is obligated to read the APA as a whole and give a reasonable construction that will uphold the agreement, rather than a construction that will render the agreement meaningless and ineffective. *See* O.C.G.A. § 13-2-2; *accord Willesen v. Ernest Commc'ns, Inc.,* 323 Ga. App. 457, 460, 746 S.E.2d 755, 758–59 (2013); *McLendon v. Priest,* 259 Ga. 59, 60, 376 S.E.2d 679, 680 (1989). Above all, the Court must **<u>ALWAYS</u>** give effect to the

intent of the parties. *See Churches Homes for Business Girls, Inc. v. Manget Foundation, Inc.,* 110 Ga. App. 539, 542, 139 S.E.2d 138 (1964).

Here, the Bankruptcy Court properly determined that the language of the APA is clear and unambiguous and applied this language to uphold the intent of the Parties. As determined by the Bankruptcy Court, "[t]he language of the APA pertinent to the convenience of the Purchase Asset states that ' at the Closing, [Debtors] shall sell, transfer, convey, assign and deliver ....... to [SIA] ...... all right, title and interest of [Debtors] in and to...... [the Purchased Assets], free and clear of all Liens......" at p. 13.  "Under the plain language of the APA, there is no ambiguity and no question as to the intent of the parties. The APA clearly requires that the Debtors convey all of the Owned Real Property, including the Common Areas, to SIA and none of the Owned Real Property was to be excluded from the required conveyance. Therefore, according to the clear and unambiguous language of the APA the Debtor is required to convey the Common Areas to SIA." (A. 554).  The decision of the Bankruptcy Court is to be affirmed.

## III.   THE BANKRUPTCY COURT PROPERLY FOUND THAT THE DUTY TO TRANSFER THE "PURCAHSED ASSETS" AND DEBTORS' "BUSINESS" WAS NOT EXTINGUISHED OR WAIVED AT CLOSING AND DID NOT MERGE INTO THE DEED.

In yet a further attempt to defeat the intent of the Parties, Appellant argues that SIA's rights to receive the "Purchased Assets" or Debtor's "Business" or Debtors' duty to convey the same extinguished "at Closing" and were thereafter

waived.  In particular, Appellant asks this Court to construe Sections 14.3 and 12.2 of the APA as forfeiture provisions, which, if applied as Appellant argues, would result in the forfeiture of SIA's rights to the "Purchased Assets" and Debtors' "Business" once Closing occurred.  In other words, Appellant argues that that even though the Parties intended for the "Purchased Assets" and Debtors' "Business," including the Kings Point Common Areas, to be conveyed from Debtors to SIA, this benefit should be forfeited simply because it was mistakenly not transferred "at Closing." For many of the same reasons discussed above, Appellant's arguments in this respect are not reasonable in that it destroys the intent of the Parties and therefore fail under Georgia law. Moreover, Appellant's argument ignores that Georgia law "abhors a forfeiture" and requires courts to avoid a forfeiture. *See Woodall v. Pharr,* 119 Ga. App. 692, 693, 168 S.E.2d 645, 647 (1969).

By asking the Court to construe Sections 14.3 and 12.2 of the APA as forfeiture provisions, Appellant continues its assault on the intent of the APA. Again, in making this argument, Appellant completely ignores the over-arching intent of the APA, which was to provide for the transfer of the "Purchased Assets" and Debtors' "Business" from Debtors to SIA in consideration of $210,000,000.00.  Yet again, Appellant makes no reference to the intent of the Parties to the APA despite couching this case as a matter of contractual construction.  Indeed, Appellant makes absolutely no effort to explain how its argued application of Sections 14.3 and 12.2

further the intent of the Parties to the APA, as opposed to defeating the same. As discussed at length above, "[c]ontracts are to be given a reasonable construction in view of the result to be effectuated," e.g. the intent of the Parties. *Talerica v. Grove Park Plumbing Serv.*, 103 Ga.App. 591, 120 S.E.2d 36, 36 (1961). Relatedly, "[w]here the purpose of the contract would be defeated by one interpretation but would be given effect by another interpretation, the meaning ascribed to the clause will be that which gives effect to the main apparent purpose of the contract." *See Wright v. Piedmont Eng'g & Const. Corp.,* 106 Ga. App. 401, 405, 126 S.E.2d 865, 868 (1962).  Appellant's assertion that Sections 14.3 and 12.2 of the APA are to be construed in a manner which results in the forfeiture of SIA's rights in the "Purchased Assets" or Debtors' "Business" is not a reasonable interpretation in light of the intent of the Parties to the APA.

Moreover, Appellant's assertion that Sections 14.3 and 12.2 of the APA are to be construed in a manner which results in the forfeiture of SIA's rights in the "Purchased Assets" or Debtors' "Business" is not a reasonable interpretation in light of the specific provisions of the APA. In arguing that the Court must construe Sections 14.3 and 12.2 of the APA as forfeiture provisions, Appellant is asking the Court to construe the APA in its entirety to require the transfer of the "Purchased Assets" or Debtors' "Business" to be temporally limited "to Closing."  Appellant's construction of Sections 14.3 and 12.2, however, is rendered unreasonable by other

29

specific provisions of the APA; notably, Sections 7.1 and 7.9.  In an effort to support its construction, Appellant's address the provisions of Section 7.1 arguing that its obligations are also temporally limited "to Closing."  Stated directly, this is simply not true. Although Appellant's accuse the Bankruptcy Court of seeking to re-write the APA, it is Appellant that asks this Court to impermissibly re-write Section 7.1 to insert language temporally limiting its application "to Closing." There is absolutely no restriction contained in Section 7.1 temporally limiting the Parties obligations to execute and deliver documents to vest good title in the "Purchased Assets" in SIA or to take all necessary steps to consummate the Transactions contemplated by the APA (i.e. the transfer of the "Purchased Assets") "to Closing" as asserted by Appellants (in fact, the word "Closing" is not used at all in Section 7.01). Unsurprisingly, Appellant's make no efforts to address Section 7.9 because there is simply no way to reconcile Section 7.9, **which expressly provides for the post-Closing transfer of some of the "Purchased Assets,"** with Appellant's argument that SIA's rights to the "Purchased Assets" or Debtors' "Business" not transferred "at Closing" were extinguished, waived, or merged.

In addition to being objectively unreasonable, Appellant's argument ignores this Court's duty to construe Sections 14.3 and 12.2 (and the APA in general) to avoid forfeiture. It is well established that Georgia law generally opposes forfeitures, and contracts "are to be so construed, if possible, as to avoid forfeitures **and to**

**advance the beneficial purposes intended to be accomplished**." *Clay v. Phœnix Ins. Co.,* 97 Ga. 44, 25 S. E. 417 (1895); *Grantham v. Royal Ins. Co.,* 34 Ga. App. 415, 130 S.E. 589, 590 (1925).  In other words, the Court's duty in construing or applying Sections 14.3 and 12.2 (and the APA in general) comes back to the cardinal rule of giving effect to the intent of the Parties. Read reasonably and in light of the over-arching intent of the APA, Sections 7.1 and 7.9 reflect a clear intent of the Parties to ensure that good title to the "Purchased Assets" and Debtor's "Business" vest in SIA regardless of timing, which is consistent with the sole purpose of the APA.

Appellant's argument regarding merger fails for the same reasons. As Appellant acknowledges, the doctrine of merger does not apply to interests that are reserved. *See Worthey v. Holmes,* 249 Ga. 104, 105(1), 287 S.E.2d 9 (1982)("[t]he general law of survival of terms and conditions is that those found in the sales contract do not survive the closing unless specifically reserved or unless they are not performed by delivery and acceptance of the deed"); *see also P.B.R. Enterprises v. Perren,* 243 Ga. 280, 282(2), 253 S.E.2d 765 (1979). Like every other aspect involving the interpretation of a contract, the application of the doctrine of merger "depends upon the intention of the parties." *Bryant v. Turner,* 150 Ga.App. 65, 256 S.E.2d 667 (1979).  Here, the APA contains a "Survival" provision at Section 13.1 which provides that "[t]he covenants and agreements of [Debtors] contained herein

31

that are by their terms to be performed after Closing shall survive the Closing for such terms." Despite Appellant's wishes otherwise, Section 7.1 does not contain a temporal limitation and obligates the Debtors at all times to execute and deliver documents to vest good title in the "Purchased Assets" in SIA or to take all necessary steps to consummate the Transactions contemplated by the APA. Moreover, Section 7.9 of the APA expressly provides for the post-Closing transfer of the "Purchased Assets." Read in concert and in light of the over-arching intent of the APA, Sections 7.1, 7.9, and 13.1 provide for Debtors obligation to transfer the "Purchased Assets" or Debtors' "Business" to survive Closing.[8] Accordingly, the Bankruptcy Court properly found that Debtors were now obligated to convey the "Purchased Assets" to SIA.

## IV. THE BANKRUPTCY COURT PROPERLY EXERCISED ITS POWER AND DUTY TO CONSTRUE THE CONFIRMATION ORDER TO PROTECT THE INTEGRITY OF THE TRANSACTION IT SANCTIONED.

---

[8] In addition to the forgoing, Georgia law provides that the doctrine of merger does not apply where there is a mutual mistake in the deed which does not reflect the true intent of the parties. *See Rasmussen v. Martin*, 236 Ga. 267, 223 S.E.2d 663 (1976). Indeed, a party "will not be prejudiced by the reformation of a deed so as to make it speak the truth." *McCollum v. Loveless*, 187 Ga. 262, 267, 200 S.E. 115 (1938). There is no dispute in this case that the Kings Point Common Areas were included in the definition of "Purchased Assets" and Debtors' "Business," and were, therefore, required to be conveyed from Debtors to SIA. To the extent they were not, then this was a mutual mistake that would bar the application of the doctrine of merger.

Notwithstanding all of the other reasons that Appellant's arguments fail, the Bankruptcy Court properly exercised its power and duty to protect the integrity of the transaction that was approved and implemented by through the Confirmation Order in applying the APA in a way that upheld the intent of the Parties by requiring the conveyance of the "Purchased Assets" from Debtors to SIA.  Indeed, the former 5th Circuit addressed a strikingly similar situation in *Apex Carpet Finishers. Inc. v. Textile Rubber & Chemical, Inc.*, 585 F.2d 1323 (5th 1978),[9] reversing the Bankruptcy Court and District Court for the Northern District of Georgia for their failure to intervene to prevent an unintentional loss and protect the integrity of a transaction that was approved by the bankruptcy court and done as an accommodation to the debtor estate.  In *Apex Carpet*, 585 F.2d. at 1324, a creditor holding a second mortgage on some of the debtor's property in a Chapter 11 case filed a motion to lift the automatic bankruptcy stay to permit it to foreclose is second mortgage.  At the hearing on this motion, the Creditors' Committee agreed to the relief, but only on the condition that the creditor agree not to assert any unsecured claims. *Id.*  Counsel for the debtor suggested that, in light of this condition, it would be simpler if the creditor simply accepted a deed in lieu of foreclosure. *Id.*

---

[9] *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent in this Circuit all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981).

Accordingly, the bankruptcy court entered an order lifting the automatic stay and permitting the creditor to take steps to foreclose some of the debtors' property. *Id.* Thereafter, the debtor delivered and the creditor recorded a deed in lieu of foreclosure for the property, which included satisfaction and release language. *Id.* Once the deed in lieu of foreclosure was recorded, a creditor holding a third mortgage on the same property requested permission to foreclose the same property arguing that the second mortgage merged by operation of law into later filed deed in lieu of foreclosure thereby elevating him from third position to second. *Id.* at 1324-1325.  The creditor holding the third mortgage also demanded possession of the property and rents from the creditor holding the second mortgage alleging that his interest was now superior as a result of the merger. *Id.* at 1324.  As a result, the creditor holding the second mortgage filed a motion to modify the Court's prior order to make clear that it retained its position as the second mortgage holder. *Id.* at 1325.  The bankruptcy court denied the motion with the result being that the interest of the third mortgage holder became superior to the interest of the second mortgage holder. *Id.* On appeal, the District Court affirmed the bankruptcy court. *Id.*

On appeal to the former 5th Circuit, however, the Appellate Court reversed these decision admonishing the Bankruptcy Court and the District Court for not intervening to protect the interests of the second mortgage holder. *Id.* The Appellate Court refused to explore the "tangled path" of Georgia's merger doctrine stating that

such analysis was not necessary because this matter arose in the bankruptcy context. *Id.* As the Court explained, "[t]he bankruptcy judge, and the district judge on appeal, approached this matter as though it were a problem in conveyancing in an arm's length business transaction between private parties." *Id.* But, the Court continued, "[t]his transaction was done with the consent of, and under the eye of, the bankruptcy court." *Id.* Therefore, "[t]he bankruptcy court has both the power and the duty to enter corrective orders protecting [the creditor holding the second mortgage] from a tremendous loss suffered unintentionally through a technical rule of conveyancing and in a transaction done as an accommodation to the debtor estate." *Id.* The Appellate Court found that, because "the clear intention of all parties participating in the hearing was to permit [the creditor holding the second mortgage] to exercise its rights as a second mortgagee in a manner that would benefit the estate," the bankruptcy court had an absolute duty to intervene to protect the creditor holding the second mortgage from losing this "important and valuable right" based on a technicality. *Id.* at 1325-1326.

The analysis of the former 5th Circuit, while also binding on this Court, could not be more applicable to the present appeal. In all respects, Appellant's arguments are a matter of form over substance. That is, Appellant's seek to defeat the intent of the Parties to the APA based upon a hyper-technical, albeit misconstrued, construction of the APA, Confirmed Plan, and Confirmation Order. Although

Appellant's construction fails for all the reasons stated herein, the decision by the Bankruptcy Court was correct even if this Court were to accept Appellant's arguments because it upheld the undeniable intent of the Parties. Whether through its construction of the APA or its power and duty under the Confirmation Order that approved the transaction contemplated by the APA, the Bankruptcy Court had an absolute obligation to ensure that the admitted intent of the Parties for the "Purchased Assets" and Debtors' "Business" to transfer from Debtors to SIA occurred, without exception, and to avoid the same loss of an "important and valuable right" based on a technicality.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court properly construed the Confirmed Plan, the Confirmation Order, and the APA to require the Debtors to transfer all of the "Purchased Assets," including the KPPOA Common Elements, to SIA, and properly found that Appellant's had no interest in the KPPOA Common Elements, as part of the "Purchased Assets" and the Court's March 4, 2016 Order is due to be affirmed.

*Certificate of Compliance: Pursuant to Fed. Bankr. R. 8015, the undersigned certifies that this Brief complies with the type-volume limitation of Rule 8015(a)(7)(B) or 8016(d)(2) because this brief contains 9,674 words, excluding the parts of the brief exempted by Rule 8015(a)(7)(B)(iii) or 8016(d)(2)(D).*

36

Respectfully submitted, this 11th day of June, 2018.

ROBERTS TATE, LLC
*/s/ Jason M. Tate*
Jason M. Tate
Georgia Bar No. 140827
jtate@robertstate.com
P.O. Box 21828
St. Simons Island, Georgia 31522
(912) 638-5200
(912) 638-5300 – Fax


*-and-*

MCGUIREWOODS LLP
*/s/ Thomas R. Walker*
Thomas R. Walker
Georgia Bar No. 732755
1230 Peachtree Street, NE
Suite 2100
Atlanta, Georgia  30309
(404) 443-5705 [direct dial]
(404) 443-5763 [direct fax]
trwalker@mcguirewoods.com

**Co-Counsel for Plaintiff Kings Point
Property Owners Association, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing was served upon the following parties by virtue of the electronic filing of this document via the Court's ECF system, as well as by U.S. Mail on this the 11th day of June, 2018:

Paul G. Jennings
Russel E. Stair
BASS BARRY & SIMS PLC
150 Third Avenue South,
Suite 2800
Nashville, TN 37201

James L. Drake
Georgia Bar No. 229250
P.O. Box 9945
Savannah, Georgia 31412


ROBERTS TATE, LLC

*/s/ Jason M. Tate*
Jason M. Tate